Rep. 500, 135 N. Y. Supp. 783. Here we find testimony that the janitor (defendant's agent) made use of the ash barrels. In view of this testimony, it may have been a technical error to dismiss the complaint; but, in view of the general conduct of this case and the production of testimony after opinions of the court, it would seem that an affirmance would best serve the ends of justice.

Judgment affirmed, with costs. All concur.

---

TRAYNOR v. NEW YORK CENT. & H. R. R. CO.

(Supreme Court, Appellate Division, First Department. March 7, 1913.)

1. MASTER AND SERVANT (§ 276*)—ACTION FOR INJURIES—SUFFICIENCY OF EVIDENCE—MANNER OF ACCIDENT.

Evidence in an action brought under the Employer's Liability Act (Consol. Laws 1909, c. 31, §§ 200–204) and Railroad Law (Consol. Laws 1910, c. 49) § 64, for the death of plaintiff's intestate while in defendant's employ as a third rail man, *held* not sufficient to show that the accident occurred while working on the third rail of a certain track.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 950–952, 954, 959, 970, 976; Dec. Dig. § 276.*]

2. TRIAL (§ 250*)—INJURIES—INSTRUCTIONS—APPLICABILITY TO ISSUES AND EVIDENCE.

In a statutory action for the death of plaintiff's intestate from the negligence of defendant, by whom he was employed as a third rail man, where the only witness for the plaintiff testified that while working on the third rail of track 13, and while exercising such lookout as the nature of the work permitted, deceased was killed by a train moving out on that track without warning, and which they did not discover until it was nearly upon them, instructions that, if deceased was not making repairs or doing some work directed by defendant's foreman immediately before he was injured, it was not defendant's duty to furnish a watchman, that, under the evidence, it could not be found that deceased was engaged in repairing track 11 or 12, but that, if he was on or about any of the tracks in the yard engaged in the performance of any duty directed by defendant's foreman, it was the duty of defendant to use reasonable care in safeguarding him, was reversible error; since it permitted a recovery, even if the testimony of plaintiff's witness was altogether discredited, and hence on a theory different from that presented by pleadings and the evidence.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 584–586; Dec. Dig. § 250.*]

Appeal from Trial Term, New York County.

Action by Elizabeth Traynor, as administratrix, against the New York Central & Hudson River Railroad Company. From a judgment for plaintiff and from an order denying a new trial, defendant appeals. Reversed, and new trial granted.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, CLARKE, and SCOTT, JJ.

R. A. Kutschback, of New York City, for appellant.

Charles Steckler, of New York City (Levin L. Brown, of New York City, on the brief), for respondent.

LAUGHLIN, J. This is a statutory action to recover for the death of Philip Traynor which occurred on the 12th day of June, 1911, and is alleged to have been caused by the negligence of the defendant in whose employ he was as a "third rail man's helper," and assigned to duty by the defendant's electrical foreman as a helper to one Quinn, whose title and designation was "third rail man."

The action is brought both under the Employer's Liability Act, so called (Cons. Laws, c. 31, §§ 200–204), and the Railroad Law (Cons. Laws, c. 49, § 64). Due notice was served upon the defendant as required by statute to authorize the maintenance of the action. The negligence charged, so far as material to the appeal, was in not furnishing a watchman for the decedent, and in operating trains where decedent was working without keeping a proper lookout or giving any signal or warning.

At the time of the accident which resulted in the death of Traynor, the defendant was engaged in constructing its terminal in the borough of Manhattan, New York, known as the Grand Central Terminal, in which two sets of tracks were constructed upon different levels, known as the upper and lower levels. One Brown was defendant's foreman in charge of electrical construction and repair work, and was known as electrical foreman. His office was in the yard north of the terminal building. On the day of the accident the decedent had been engaged with other members of a gang under the direction of Brown in third rail construction work on the lower level, and, after finishing this work, they reported at Brown's office at about 2 o'clock in the afternoon, and he directed Quinn and the decedent "to get a carpenter's kit," and to go out in the yard on the upper level, and to repair defective protection on the third rail of different tracks which he had observed or which had been brought to his attention, and also instructed them, in effect, to look about and repair any defective protection on the third rail of any of the tracks. The tracks on the upper level were in use at the time by passenger trains in coming in and going out and for making up such trains and storing the cars. The trains and cars were moved by electrical power transmitted through the third rail. The third rails were protected by strips of pine wood about 10 feet long and 4 or 5 inches in width, and an inch and a half or more in thickness called "caps," and each cap is grooved on the under side, so that it fits over the rail, and, according to the testimony of Brown, it is nailed from underneath to another strip of wood which "goes underneath" the third rail. It was their duty, when they found any protection broken, to take it off, and put on a new strip of wood, and, if they found any of it loose, to renail it and "to leave everything secure so that nobody would be injured by the third rail." The decedent had been in the employ of the defendant performing like services for about six months. No one accompanied or was directed to accompany the decedent and Quinn, and they carried their tools. The tracks were numbered from the Lexington avenue side of the terminal westerly, and there were 30 on the upper level.

Quinn, the only witness for the plaintiff, was interested, for he had an action pending against defendant for the injuries which he sus-

tained. He testified, in substance, that he and the decedent first went to track 9 or 10, and did repair work, and, after finishing there, they repaired five or six other defects in the protection on the third rail in the vicinity, and then went to the third rail of track 13, which was on a level with and about two feet to the west of the westerly rail of that track, and directly under the edge of a passenger platform to the west of track 13, the surface of which was about 4 feet above the track, that they had both been working there some little time "nailing up some loose strips that were under the protection," and they were about 10 feet apart, the decedent being to the north; that the place where they were working was about midway between the north and south ends of the platform; that while doing their work they were obliged to lean over and look toward the ground; that the work that they were doing at the time could not be performed by one of them, so that the other could watch, but that they looked up from their work from time to time and watched for trains; that they had taken a cap about 10 feet in length off the third rail, and decedent was on his knees driving nails up from the under side; that in putting a cap on a third rail it is necessary for one man to hold the strip of wood while the other drives the nails; that the witness had worked about the yard about a year, and on several occasions three men would be sent to perform such work, and one would be given a whistle or megaphone or red flag, and would act as watchman; that he then looked up and saw a train coming out towards the north on the track on which they were working, and only 10 or 12 feet away; that they could not escape to the west on account of the height of the platform, and because the space under the platform was filled with braces; that he saw decedent while driving nails a minute or so before look up and down the track; that, as soon as he discovered the train, he attempted to cross the tracks to a space between tracks 12 and 13, and saw decedent doing the same; that they did not have time to get across track 12 for the reason that another train was backing in on that track, and they attempted to stand between the tracks, the space between the overhang of the cars being 16 inches; that the trains met about where they were standing, and they were struck by one or the other of the trains, and the decedent was instantly killed; that neither train gave any signal or warning; that they commenced to work on this rail between 4:45 and 5 o'clock, and the accident occurred between 5:30 and 5:35 o'clock; that about five minutes after they started to work at this rail a train came in and went out on track 13, and they were obliged to step off onto track 12 and wait about five or ten minutes until it went out, as it stood where they had been working; that after this train went out cars which had been standing on track 13 at the southerly end before that train came in still remained there, and the nearest one of those cars was about 175 feet south of where they were working, and those cars or part of them formed the train which drove them from their work, and caused or resulted in causing the accident.

The cars which remained standing on track 13 after a train came in and went out each contained an electric motor, and were called

multiple unit cars, and apparently all looked alike, from the front at least.

On behalf of the defendant, it was shown by the testimony of witnesses who operated the trains and whose duty it was to direct the operation thereof that from 8:56 a. m. that day three cars had been left standing at the southerly end of track 13, and that they were to form part of a train to leave at 6:25 p. m. that day; that a train consisting of six cars came in on that track at 4:55 p. m. from White Plains and stopped with a space between it and the three cars standing to the south and remained there until 5:36 p. m., when it started to leave again for White Plains, and when the accident which was caused either by that train or the train backing in on track 12 occurred. That evidence not only tends to show that no train came in and went out on track 13 as testified to by Quinn, but that with the nine cars standing on track 13, as stated, Quinn and the decedent could not have been working opposite the middle of the platform, for the evidence shows that the platform is only about the length of 13 cars which are 60 feet in length, and if, as Quinn says, he and the decedent were working about 175 feet to the north of the north car, and there were nine cars thus standing on this track, he and the decedent must have been working within about 65 feet of the north end of the platform.

The defendant called nine witnesses who were either eyewitnesses to the accident, or who testified to circumstances immediately attendant upon the accident. One of them was a passenger on the outgoing train and wholly disinterested, and three of the others were employés of the defendant who were riding on the train, but had ho duty to perform thereon, and the conductor on the incoming train, and the engineman on the outgoing train, and two trainmen, one on the outgoing and the other on the incoming train, and, while their testimony is not entirely in accord, it is all in conflict with the testimony of Quinn, and tends to show that he and the decedent were not working on the third rail on track 13 immediately prior to the accident, but were to the east upon or in the vicinity of track 12, and were not at work at all.

[1] If, as Quinn testified, he and the decedent were working on the third rail of track 13, and were put in jeopardy by the train on that track moving out without signal or warning, and that its movement was not discovered by them until it was nearly upon them although they had made such observations as the nature of their work permitted, then, doubtless, the defendant would be liable, either upon the theory that the foreman was negligent in requiring them to perform work in such a dangerous place without furnishing a watchman to warn them or to signal trains, or under section 64 of the Railroad Law, for the negligence of the engineman of the train which moved out on track 13 or the employé of the defendant in charge of the movement of the train on track 12; but we are of opinion that a finding that the accident occurred as Quinn testified to would be clearly against the weight of the evidence presented by this record.

But it is not entirely clear that the verdict was based upon the testimony of Quinn, for the learned trial court in submitting the case to the jury permitted them to find a verdict in favor of the plaintiff if the

decedent was on or about *any of the tracks in the yard engaged in the performance of any duty which he was directed to perform by defendant's foreman.*

[2] Before the court instructed the jury, or during the giving of such instructions, counsel for the defendant handed up certain requests in writing. One of these was as follows:

"That if the jury find that Traynor, the deceased, was not engaged in making repairs immediately before he was injured, it was not the duty of the defendant to furnish a watchman to keep a lookout for the movement of trains and to inform Traynor of such movement."

At the close of the charge, the court in passing upon these requests modified this request, and charged it as follows:

"That if the jury find that Traynor, the deceased, was not engaged in making repairs, or in the performance of some duty he was directed by defendant's foreman to perform, immediately before he was injured, it was not the duty of defendant to furnish a watchman to keep a lookout for the movement of trains and to inform Traynor of such movement."

And thereupon further instructed the jury as follows:

"In regard to this modification and the several modifications of other requests, I state that I have modified the requests in the form in which they have been modified by reason of the testimony which appears in the case given by defendant's foreman, that he not only directed the decedent and Quinn to perform work on the particular tracks mentioned, but directed them to make repairs where they found them to be needed, and this might necessarily involve the duty of looking to see where repairs were needed."

The court was requested to further instruct the jury that "under the evidence the jury may not find that plaintiff's intestate was engaged in making repairs on tracks 12 and 11 immediately prior to the accident," to which the court replied:

"I so charge, but I charge you in that connection that, if the decedent was on or about any of the tracks in that yard engaged in the performance of any duty which he was directed by defendant's foreman to perform, that it was the duty of the defendant to use reasonable care and precaution in safeguarding him in the performance of that duty."

Counsel for defendant duly excepted to the refusals of the court to charge as requested in each instance and to the charge as modified.

The jury may well have understood that the court in declining these requests intended to permit them to find a verdict for the plaintiff, even though they disbelieved the testimony of Quinn in toto. This we think was error. If the accident had occurred as Quinn testified, and the decedent was not even working on track 12 or 11 immediately before the accident as the court instructed the jury, and, as I think, all of the evidence shows, then a recovery could not be had, for it would be based upon a theory different from that presented by the pleadings and the evidence.

It follows, therefore, that judgment and order should be reversed, and a new trial granted, with costs to appellant to abide the event. All concur.